UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:08CR 18 CAS |
| ) | |
| LEONARD LINDSEY SMITH, ) | |
| ) | |
| Defendant(s). ) | |

## REPORT AND RECOMMENDATION

The defendant, Leonard Lindsey Smith, filed his Motion to Suppress Evidence and Statements (Document #31). The government filed Government's Response to Defendant's Motion to Suppress Evidence and Statements (Document #33).

### Factual Background

On September 24, 2007, Dunklin County, Missouri, Deputy Sheriff A. W. Fisher received notice that there was an active arrest warrant for Kristopher Anstiss and that Anstiss might be staying at a residence in Dunklin County located on State Highway F. Deputy Fisher patrolled that area but did not observe any person fitting Anstiss's description there. Fisher did observe a late 80's model GMC truck at the home.

The next day, Fisher continued to patrol near F Highway. He noticed that the GMC pickup was missing from its previous location. Fisher began driving in a larger pattern, trying to locate the GMC pickup. He was trying to determine if Anstiss might be driving that truck.

Around 10:08 P.M., on September 25, 2007, a late model GMC pickup on State Highway AC. Fisher turned his vehicle around and began following the truck. The license plate on that truck displayed an Arkansas registration, 854 XLI. Fisher requested and received a computer check of that

registration. The results of that check showed that the license plate had been issued to a silver 1989 Pontiac Firebird. The display of license plates on a vehicle which were originally issued to another vehicle is prohibited by R.S.Mo., §§ 301.130 and 301.320. Fisher decided to stop the GMC truck.

Fisher activated his emergency lights, but the truck did not immediately pull over. The truck began moving erratically. After traveling about 50 yards, the truck made an abrupt right turn off the highway onto an unpaved driveway of a residence. The truck suddenly accelerated and pulled to an abrupt stop at the rear of the house. Fisher had followed the truck, stopped, got out of his patrol car and drew his sidearm. He shouted at the driver to extend his arms out his window. The driver did not obey that command but began making movements inside the truck. Only on the third time Fisher gave his order did the driver comply. Fisher then told the driver to get out of the truck and walk over to his location. The man did so. Fisher identified himself as a Dunklin County deputy. The driver identified himself as Lindsey Smith, Jr.

Fisher decided to pat Smith down for weapons, due to Smith's actions. In Smith's right front trouser pocket, Fisher could feel an item that felt like a folding pocket knife. Fisher then asked Smith if he had a knife in that pocket. Smith stated that he did have a knife in that pocket. Fisher told Smith that he (Fisher) was going to reach in that pocket and secure the knife. Fisher reached in the pocket, grabbed the knife and pulled it out. A plastic baggie also came out of the pocket at the same time. The baggie contained some off-white material that Fisher believed to be methamphetamine. Fisher told Smith he was under arrest for Possession of a Controlled Substance. Fisher placed handcuffs on Smith and searched both Smith and the interior of the truck. No other items were found in these searches which were seized.

Fisher conducted a computer check as to the driver's license status of Smith and discovered that Smith did not have a valid driver's license. Fisher took Smith to the Dunklin County Jail.

Fisher read the Miranda warnings to Smith from a printed form. After each warning, came the question, "Do you understand?" Smith wrote "yes" after the question followed by his initials, indicating that he understood the warning. Smith also signed the form, in two places, indicating his understanding of his rights, that he was waiving his rights and was willing to make a statement without a lawyer present. Smith also stated verbally that he understood each Miranda right and that he was willing to make a statement.

Smith first told Fisher that he was not in possession of methamphetamine. He stated that he must have accidentally picked up the drugs at a friend's home just prior to being stopped. Smith could not remember the names of those friends.

Then Smith said that he has a drug problem with methamphetamine and that he needed help with that problem. Smith said that he knew Kristopher Anstiss. Smith said that he knew that Anstiss was wanted and that Anstiss was on the run because of the arrest warrants. Smith stated that Anstiss was not at his residence at that moment.

Fisher asked for permission to search Smith's house for Anstiss. Smith agreed to the search request and signed a form giving that consent. Although the form did not contain any written limitation, the officers told Smith that they would only be looking for Anstiss during that search.

After the consent was signed, Fisher, Smith and four deputies went to the Smith house. Smith was allowed to enter the residence and secure his pit bull dog to a chain outside the residence. Smith then opened a garage door and the deputies began their search. They discovered Max Burrow in the house, but no other person.

When Fisher entered the house, he could smell burnt marijuana. He observed some ammunition in the garage in plain view and pointed that out to another officer. Fisher looked under a bed for any hidden persons and saw a rifle that had an attachment on its barrel that appeared to be

a silencer. Fisher seized that firearm. Fisher then saw a marijuana cigarette on a night stand. He met with other officers, who reported seeing marijuana and ammunition in the house.

Fisher then brought Smith into the house and told him about the marijuana, ammunition and firearm that had been seen. Fisher asked for consent to expand the search to include weapons and narcotics. Smith orally consented to this expanded search. Smith also stated that there were more drugs in the house.

The officers began another search of the house. Smith provided a key which the deputies used to open a padlocked refrigerator. Several plastic bags of suspected methamphetamine were discovered in the refrigerator, along with a glass pipe used for smoking drugs.

The above-described items and a quantity of ammunition were all seized.

On January 4, 2008, officers executed a federal search warrant at the Smith residence. Smith was present at the time of the search. Several items were seized from the house, including three firearms, several rounds of ammunition, drug use paraphernalia, drug manufacturing items and some marijuana.

Smith was interviewed by ATF Special Agent David Diveley after Diveley read Smith the Miranda warnings. Smith stated that he understood his rights and was willing to make a statement. Smith told Diveley that the firearms belonged to other persons and that he did not know where the ammunition came from.

The testimony offered at the evidentiary hearing was that of Deputy Sheriff Fisher and Special Agent Diveley. The defendant did not testify.

Smith seeks to suppress the evidence and statements referred to above.

## Discussion

## The Stop and Pat-Down Search

Around 10:08 P.M. on September 25, 2007, Dunklin County Deputy A. W. Fisher met a late model GMC pickup on State Highway AC. Deputy Fisher turned his vehicle around and began following the truck. The license plate on that truck displayed an Arkansas registration 854 XLI. Fisher conducted a computer check of that registration. The results of that check showed that the license plate had been issued to a silver 1989 Pontiac Firebird. Display of license plates on a vehicle which were originally issued to another vehicle is a violation of RSMO §§ 301.130 and 301.320. Violation of traffic laws provides valid grounds for effecting a traffic stop. Whren v. United States, 116 S.Ct. 1769, 1777 (1997); United States v. Chatman, 119 F.3d 1335, 1340 (8th Cir. 1997), cert. denied; United States v. Cummins, 920 F.2d 498, 500 (8th Cir. 1990), cert. denied; United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005). Once an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" United States v. Bloomfield, 40 F.3d 910, 915 (1994) (quoting Cummins, 920 F.2d at 502.) "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." Id.

Fisher activated his emergency lights, but the truck did not immediately pull over. Instead, the truck began moving erratically, "to the left and the right real quick," within the lane. The truck was moving quickly within the driving lane as the driver was moving erratically inside the vehicle. (Tr. 13) Fisher estimated the truck he was following traveled about 50 yards before it took further action to leave the road. It did not pull off the road at any time to the side of the road and stop. The truck made a very sudden righthand turn off of the roadway into an unpaved driveway of a residence.

Fisher estimated the truck was going 25 to 30 miles an hour when it made the turn into the driveway. Once the driver of the truck turned into the driveway, he accelerated the vehicle and "traveled at a pretty good rate of speed, high rate of speed to the rear of this residence." Then the vehicle came to a sudden and abrupt stop. When Fisher caught up, he exited his patrol car, but the driver stayed in the truck. Fisher then began giving loud and clear commands for the driver to show his hands, extend his hands. (Tr. 15) The driver did not comply with the request. Fisher observed further motions. The driver was "moving around real fast, moving to his right. He was not complying with any of my directives." (Tr. 16) The driver of the vehicle did not comply with a second set of commands to extend his hands, in the words of Deputy Fisher, "making quick motions inside of the vehicle." The third time Fisher gave the same commands, the driver of the truck complied. He raised his hands, showed both hands and extended them out of the driver's window. (Tr. 18) The driver was then told to exit the vehicle. Fisher identified himself as a deputy with the Dunklin County Sheriff's Department. The driver responded that he was Lindsey Smith, Jr.

Because of the actions of Lindsey Smith, his erratic driving, failure to respond to the officer's emergency lights and after traveling 50 yards, pulling abruptly and at a high speed into a driveway, driving to the rear of the residence and stopping, refusing twice commands to place his hands outside the vehicle, for officer safety, Fisher felt he should conduct a pat down. (Tr. 20) In addition, before Deputy Fisher's encounter with Lindsey Smith, other officers told Fisher that in the past they had had dealings with Mr. Smith, that Smith was known to carry weapons, namely, handguns. He was also known to wear a boot that was a pointed-toe boot, cowboy boot that had a blade on the end of it. (Tr. 20).

The patdown was called for and justified by the circumstances. Terry v. Ohio, 392 U.S. 1, 22-24; United States v. Hanlon, 401 F.3d 926, 929 (8th Cir. 2005).

During the patdown, a weapon was identified in the defendant's pocket, and the defendant acknowledged that it was a knife. When Deputy Fisher pulled out the weapon, a baggie containing off-white material came with the knife. Fisher believed it was methamphetamine. Deputy Fisher told Mr. Smith he was under arrest and handcuffed him. Later, Fisher had a check on Smith's driver's license, which indicated that Mr. Smith did not have a valid driver's license.

## Miranda Warnings

Fisher took Smith to the Dunklin County Jail. At the jail, Deputy Fisher read the Miranda warnings to Mr. Smith from a Statement of Rights Miranda Warning, a form used by the Dunklin County Sheriff's Office. The form was introduced at the evidentiary hearing as Government's Exhibit #1. On the form, after each of the warnings in response to the question, if he understood, defendant wrote "yes" followed by his initials. The defendant signed his full signature below the recitation of rights. Fisher testified that he read each warning verbally and asked after each warning if the defendant understood, and the defendant stated he did and that was when he wrote "yes" on the form followed by his initials beside each right. Fisher then read the entire paragraph titled Acknowledgment and Waiver of Rights. Fisher asked Smith if he understood the Acknowledgment and Waiver of Rights, and Smith said he did. Fisher testified that he makes a practice as the waiver of rights is signed, to say, "By you signing this, you're acknowledging that you're waiving your rights and you're going to talk to me without an attorney present," which is followed by "Do you understand that?" Mr. Smith signed the form again.

## Permission to Search

Fisher testified that no questions were asked or answers given about the offense before the Miranda warnings were given and Government's Exhibit #1 was fully completed. (Tr. 27)

After speaking with Mr. Smith about the methamphetamine found in the defendant's pocket, Fisher brought up the fact that the Dunklin County Sheriff's Department had received information that Kristopher Anstiss was possibly hiding out at Smith's residence. Smith responded that he knew Anstiss, that he was wanted and on the run, but he denied Anstiss was at his residence. Smith admitted that Anstiss had been there in the past but wasn't there at that time. Fisher then asked Mr. Smith if the officers could search his residence for Mr. Anstiss, and Smith signed a Permission to Search form which was introduced at the evidentiary hearing as Government's Exhibit #2. The form gave general permission and was not limited, but the understanding between both Fisher and Smith was that the permission was actually limited to the officers' search for Anstiss. (Tr. 31)

The officers went to the defendant's house to look for Anstiss. Mr. Smith opened the door with his keys. Mr. Smith secured his dog, a pit bull, by taking him out of the residence and putting him on a chain attached to a tree out in the yard. The officers then searched the home for Mr. Anstiss. They did not look in cabinets or a refrigerator but only in places where a person could be found or hide, such as closets, storage areas, living room, bedroom and under beds. (Tr. 34) Under one of the beds, Fisher saw a long rifle.

When the officers entered the house, there was an obvious odor of burnt marijuana in the garage area. In the living spaces in the home, the odor of marijuana was more evident. The odor permeated the house. The officers saw partially burned marijuana cigarettes "throughout the house in plain view as we were searching for Mr. Anstiss." (Tr. 35) The cigarettes were in ashtrays on top of a table. There were other items of ammunition found in the house.

After a search for Anstiss was completed and Anstiss was not found, Fisher and Deputy Pratt talked to Mr. Smith and told Smith that they had seen ammunition throughout the house, as well as a gun. They smelled the odor of burnt marijuana and observed partially burned marijuana cigarettes

- 8 -

in plain view. The officers asked Smith a second time for his consent and his permission to search the residence again, this time to expand the scope of the search. Fisher told Smith that they were going to be looking for weapons and narcotics. Smith told the officers he gave his permission for the expanded search. He also told the officers that there were more narcotics in the house. (Tr. 36)

In the southwest bedroom, there was a miniature refrigerator that was not hooked up to electricity, and it was secured by a hasp and a lock. The officers thought that was odd. Mr. Smith produced a key for the lock from a reel key chain on his belt. Smith picked out one of the keys and told the officers, "This is the key that goes to that lock" and handed it to Deputy Aaron Pratt. Pratt unlocked the refrigerator, and the officers found more methamphetamine. In addition, the officers found another barrel attachment and an item of paraphernalia. The items found and seized were either drug related or firearms related. (Tr. 38) The officers seized what they thought was a silencer. It turned out to be just a piece of the original firearm.

In order for a consent to search to be found voluntary, it must be the product of the defendant's free and unconstrained choice, rather than the product of duress or coercion, either express or implied. Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). There is simply nothing in the record that would indicate that Mr. Lindsey Smith's consent was the product of duress, coercion or police trickery. The defendant signed both the Waiver of Miranda Rights and the Consent to Search his home. The testimony indicates that Mr. Smith was treated completely fairly. The officers acknowledged that the first search for Mr. Anstiss was only for the fugitive, even though the search form signed by Mr. Smith was a general form. When there appeared to be contraband, both a weapon and illegal drugs present, the officers requested an expanded scope for the search, and Mr. Smith consented.

A number of other weapons were found in Mr. Smith's residence as listed on the inventory of items seized and introduced as Government's Exhibit #3. Deputy Fisher testified that the weapons were seized because Fisher had previously been told that Lindsey Smith was a convicted violent felon. (Tr. 68)

The court finds that the original stop of Lindsey Smith, Jr. was valid because it was the result of a violation of traffic laws, that is, the display of license plates on Mr. Smith's vehicle that had been issued to another vehicle. Based on the defendant's erratic movements, abrupt stop at the back of a residence, defendant's bodily movements within the vehicle after the stop, his failure to respond to Deputy Fisher's commands two times to place his hands outside the vehicle and Fisher's knowing previously from other officers that Smith was known to carry weapons and specifically a handgun, the patdown search of the defendant was legal and appropriate. Terry, 392 U.S. at 22-24.

In the search for weapons, Fisher felt what defendant acknowledged was a knife, and when Fisher withdrew the knife, the baggie of methamphetamine came with it. The defendant was arrested. The defendant was advised of the Miranda warnings and acknowledged and waived those warnings before any questioning took place. He understood and voluntarily waived his right to remain silent and spoke to Fisher about the methamphetamine and even Smith's need for help with his methamphetamine habit.

Mr. Smith gave a limited permission to search for Anstiss. The permission was expanded when the officers found a weapon and marijuana. The defendant agreed to an expanded search for additional weapons and drugs. The broader consent to search was given voluntarily and with understanding.

The court finds the marijuana, methamphetamine, paraphernalia and weapons found in Lindsey Smith's home were legally seized as the result of defendant's valid, voluntary consent, are

admissible in evidence and should not be suppressed. In addition, the defendant's statements were made after he had been given the Miranda warnings and had voluntarily and knowingly waived his rights to remain silent.

## The Search Warrant

David J. Diveley, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives for twenty years, applied for a search warrant. The court is aware that it is the judge who issued the search warrant; however, the analysis by the undersigned concerning probable cause for the issuance of the search warrant will be reviewed de novo by the United States District Judge to whom this case is assigned. Any objection to the Report and Recommendation of the undersigned, including findings concerning probable cause and the validity of the issuance of the search warrant, will be considered and ruled on de novo by the District Judge.

## The Affidavit

The Affidavit in support of the Application for the Search Warrant which was executed on January 4, 2008, recites that the defendant, Lindsey L. Smith, was convicted in 1983 in the Circuit Court of Dunklin County, Missouri, of the felonies of Stealing and Second Degree Assault. He was convicted in 1991 in the Eastern District of Arkansas of the offense of "Conspiracy to Possess with Intent to Distribute Marijuana" and in June, 2002, in Greene County, Arkansas, of "Possession of a Controlled Substance."

The affidavit continues that on September 25, 2007, in a consent search of Lindsey Smith's home, Dunklin County, Missouri, deputy sheriffs seized four firearms and 1,000 rounds of ammunition.

On December 13, 2007, Dunklin County deputies interviewed Logan Stricker at the Greene County, Arkansas, Jail. Stricker had asked to be able to help himself in an ongoing criminal case

and completed a written statement for the Dunklin County deputies. In the statement, Stricker revealed he had been at the Smith residence on December 4, 2007, to repossess a vehicle that had been used by Mr. Smith. As Stricker approached the Smith residence, Smith met Stricker outside the house and "waved what appeared to be a .38 caliber revolver in Stricker's face." Stricker and Smith engaged in a verbal confrontation, and Stricker left without the vehicle or money.

On December 15, 2007, Greene County Sheriff's officers interviewed Elizabeth Friar, also incarcerated in the Greene County Jail. On December 3 or 4, 2007, Friar drove Stricker to the Smith residence. Smith was on the front porch and when Stricker was two or three feet away from Smith, Smith pulled a gun out and pointed it at Stricker's head. As Friar and Stricker were pulling away from the Smith residence, Friar heard Smith say, "Let me put this (referring [to] the gun) back in the house and we can go out in the yard."

Agent Diveley's affidavit continues that on December 19, 2007, Agent Diveley spoke with Stricker and Friar by telephone. Friar said that she thought the gun Smith pulled on Stricker was a revolver. Stricker said he thought the gun pulled on him on December 4, 2007, was a revolver with wooden grips. Stricker said that three or four months previously Stricker had seen Smith in possession of a short-barreled .22 caliber rifle in Smith's bedroom.

Diveley advised Friar and Stricker of the federal statute forbidding lying to a federal agent and of the criminal penalties for doing so. Friar and Stricker maintained that "Knowing the full consequences of the statute, they state that their statements are true and accurate."

Agent Diveley continued in the affidavit that on December 30, 2007, Dunklin County sheriff's officers received a telephone call from a female stating she had been assaulted by Smith at his residence and that Smith had put the barrel of a handgun in the woman's mouth during the assault. Deputies went to the house to check on the well-being of the female. Smith allowed the

officers to look in the house for the woman who was not found. Deputies did not conduct a search for weapons at that time. The affidavit continues that the deputies later discovered that the female who had been living at the Smith residence was safe and at another location.

Agent Diveley continued in the affidavit that based on his training and experience, he knows that people who possess firearms keep their firearms in their residences for long periods of time and that those who buy and sell firearms are known to keep records of these transactions.

## Probable Cause

The United States Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. As the Supreme Court stated in Gates more fully, Id.:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. Jones v. United States, 362 U.S., at 271, 80 S.Ct., at 736.

The Supreme Court rejected the prior tests required by Spinelli v. United States, 393 U.S. 410, 898 S.Ct. 584 (1969), finding that "the complex superstructure of evidentiary and analytical rules that some have seen implicit" in the Spinelli decision cannot be reconciled with the fact that many warrants quite properly are "issued on the basis of non-technical, common sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." Id. at 235, 2331. The Court offered the following caution to reviewing courts, Id. at 236, 2331:

Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." Spinelli, supra, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," Ventresca, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." Id., at 109, 85 S.Ct., at 746.

Probable cause is

a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. As we said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

Gates, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court found, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from Brinegar v. United States (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

As the Supreme Court stated in Gates, our review of the sufficiency of the affidavits should not take the form of a de novo review.

### Reliability of Statements Included in the Affidavit

The Affidavit of Special Agent Diveley recited the fact that Lindsey Smith had been convicted of four felonies, one for Second Degree Assault and two for drug crimes. He referred to the fact that the previous September four firearms and more than 1,000 rounds of ammunition were found in Smith's residence.

The statements of Stricker to Diveley related his encounter with Smith on December 4, 2007, as he approached Smith's residence to repossess a car when Smith waved a .38 caliber pistol in Stricker's face. The separate interview of Elizabeth Friar corroborated Stricker's story as Stricker's interview provided substantiation for Friar's.

The Gates court, after accepting as reliable the anonymous tip of an unquestionably honest person who comes forth and reports criminal action–which, if fabricated, would subject him to criminal liability– about which the rigorous scrutiny of the basis of his knowledge the court found unnecessary, the court continued to speak of individuals like Stricker and Friar. "Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." 462 U.S. at 233, 234, 103 S.Ct. at 2330. Agent Diveley took pains to remind Stricker and Friar of the penalties for lying to a federal agent.

Agent Diveley's affidavit continues that on December 30, 2007, the Dunklin County Sheriff's Office received a telephone call from a female stating that she had been assaulted by Smith at his residence and that Smith had put the barrel of a handgun in the female's mouth during the assault. The officers checked this out. The female who called was not there, but, as the affidavit states, she had been living at the Smith residence and officers later found she was at another location and safe. If the information came from an ordinary citizen, who has no motive to lie and who was a firsthand observer of the information given, the information may be considered trustworthy. Gates, 462 U.S. 213, 103 S.Ct. 2317.

All of these reports of criminal activities by Smith were characterized by what the Court of Appeals in United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990), described as "the richness and

detail of a firsthand observation." (citing Gates) The separate interviews of Stricker and Friar by Dunklin County deputies confirmed each other.

With respect to the anonymous female caller on December 30, 2007, the officers did everything they could to corroborate the caller's information, including going to Smith's home and searching the home, even being concerned enough to report that the woman had been at the Smith residence but was now at another place and was safe. "The corroboration of minor innocent details can suffice to establish probable cause." United States v. Reiner Ramos, 818 F.2d 1392, 1397 n. 7 (8th Cir. 1987).

Agent Diveley's personal calls to Stricker and Friar to check with them is similar to the agent's action in United States v. Robertson, 39 F.3d 891 (8th Cir. 1991), who met with the informant to question the informant face-to-face and to determine whether he or she appeared to be a credible person. In that case, detailed information supplied by a previously unknown informant who met with a federal agent but requested anonymity, together with corroborating information, subsequently obtained, furnished probable cause to issue a search warrant. The Court of Appeals found "that firsthand observation gives greater weight to Agent Thom's decision to rely on the informant's information. See United States v. Lloyd, 36 F.3d 761, 762-63 (8th Cir. 1994)." 39 F.3d at 893.

Stricker, Friar and the anonymous female were all eye witnesses. "An informant who alleges he is an 'eye witness' to an actual crime perpetrated demonstrates sufficient 'reliability' of the person." McCreary v. Sigler, 406 F.2d 1964, 1969 (8th Cir. 1969)(probable cause found even under older stricter Aguilar-Spinnelli test."); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329 (1959).

The court finds that there were sufficient indicia of reliability in the information provided to Agent Diveley and included in the Affidavit presented to the Magistrate Judge which provided "a fair probability that contraband [would] be found in the particular place." Gates, 462 U.S. at 238,

103 S.Ct. at 2332. Consequently, this court finds that the search warrant served at the home of Lindsey Smith on January 4, 2008, was issued based on probable cause. The court further finds that the contraband seized during the execution of the search warrant was legally and properly seized, should not be suppressed and is admissible in evidence. In addition, statements made by the defendant to Agent Diveley at the Dunklin County Sheriff's Office on January 4, 2008, were made after <u>Miranda</u> warnings were again given to Mr. Smith who acknowledged he understood them and had no questions. The court finds the statements made to Agent Diveley on January 4, 2008, were made after defendant voluntarily and knowingly waived his rights under <u>Miranda</u>. Those statements are admissible in evidence.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Document #31) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

                          LEWIS M. BLANTON
                          UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of May, 2008.